vides * * * "Second, a division having charge of the repairing, cleaning, and lighting of the streets, avenues, alleys, highways, public grounds and catch basins. of which division there shall be a chief officer, to be called the superintendent of streets."

The charter law applies only to cities of the first grade of the second class (Columbus).

On March 22, 1898, the legislature amended sections 2486, 2487, 2488 and 2389, whereby the council of any city or village was empowered to erect electric works at the expense of the corporation, or to purchase any electric works already erected therein, and in the carying out of such powers to create and appoint a board of trustees to perform the duties incident thereto. The amendment made to said sections in 1898 consisted mainly in enlarging the scope of said sections by making them applicable to electric works, they, prior to that time, having only applied to gas works.

It is conceded that, prior to 1898, under the charter law the entire control of the lighting of the city, was vested in the director of public improvements. The charter law contains no reference to sections 2486, 2487, 2488 and 2489. These sections are a part of the general act or statute and their amendment was the amending of a general statute. Does such amendment affect, by implication, that part of the charter law, giving to the director of public improvements the control of the electric lighting plant.

"A local or special act is not invalid or otherwise affected by the conflicting provisions of a subsequent general statute on the same subject, unless the legislative intent that such effect be given the later enactment is clearly manifest.."

Commissioners v. Board of Public Works, 39 O. S., 628.

The following is from the opinion of judge Owen in the same case: (page 632).

"Repeals by implication are not favored. So, particular and positive provisions of a prior act are not affected by a subsequent statute treating a subject in general terms and not expressly contradicting the provisions of the prior act, unless such intention is clear .

Endlich on Interpretation of Statutes, section 223, says:

"It is but a particular application of the general presumption against an intention to alter the law beyond the immediate scope of the statute, to say that a general act is to be construed as not repealing a particular one, that is, one directed towards a special object or a special class of objects. A later affirmative law does not abrogate an earlier one by mere implication.

"The general statute is read as silently excluding from its operation the cases which have been provided for by the special one; for as was said of the relation of a general act to a local one applying to a single county of the state, 'it is against reason to suppose that the legislature in framing a general system of the state, intended to repeal a special act which local circumstances of one county have made necessary".

Again, it has been held that when a general law relating to municipal corporations contains no provision expressly applying, e. g. to the levy and collection of taxes, etc., by cities incorporated under a special statute, the provisions of the latter on the subject remain in force.

Burke v. Jeffries, 20 Iowa. 145.

The same general principles are announced in the sections from Sutherland on Statutory Const. cited by counsel for the city.

The authorities quoted point with unerring certainty to the conclusion that the amendments of 1898 to the general statutes upon the subject of gas and cletric light works do not affect or quality the authority of the director of public improvements over the electric light plant, and hence we could have no right or authority to surrender to the other defendants herein the control of said plant.

If the legislature of 1898 had intended that the amendments referred to should embrace electric light plants then in operation, as was the plant in this city, the language used would have been more comprehensive. These amended sections concern only gas works or electric works to be purchased or erected, not such works erected or in operation. A city might purchase from a private party an electric works in operation, but that is not this case.

A mandatory order to the director of public improvements commanding him to operate the electric light plant now owned by the city would be warranted by the circumstances of this case, but for the fact that the plaintiff admits that the city council has failed to provide funds for its operation. If this be true, and the city council has not, by a vote of three-fourths of all the members elected thereto waived the exaction of any liability from the bondsmen of said defendant for debts contracted by him beyond the amount appropriated for such purpose, by ordinance of said council, and it appears that there is no such waiver, then said defendant can not be compelled to operate said municipal plant. So far as the pleadings show the fault is in the city council to properly provide funds for such purpose, the reason for such failure not being disclosed by the attorneys in the case.

Finding and decree accordingly.

---

(Superior court of Cincinnati.)
(Special term.)
NATHANIEL WRIGHT v. THE UNION CENTRAL LIFE INSURANCE COMPANY.

---

Where the evidence discloses that the making of an abstract of title to real estate has been confided in an attorney at law, the court will assume that his legal knowledge and power of judgment and discrimination was desired in order that what does and what does not affect the title investigated might be correctly determined; and where the property is valuable and the title is complicated, involving risk and responsibility on the part of the abstracter, the abstract will not be regarded as a mere mechanical commodity when the fee for its production is to be fixed, but the professional learning of the abstracter and the confidence reposed in him by his employer will be taken into the account.

DEMPSEY, J.

This is an action to recover the sum of $400 for alleged professional services rendered by plaintiff, an attorney at law, in the examination and abstracting of the title to very valuable real estate under an employment by the defendant. The only defense is as to the amount of the recovery, the defendant's contention being that the services rendered were worth only $100, for which amount it offers to confess judgment.

The claim of the defendant is that the abstracting of titles has now become a formalized business, and this to such an extent that it has been taken out of the range of purely professional activity, and no more forms a part of the lawyer's peculiar duties. In other words, it is the defendant's contention that an abstract of title is now nothing more than a merchantable commodity, selling in the market for the prices usually paid for such commodities to those who make a business of searching and abstracting the public records; and that the result of one's labors, when condensed and produced in the form of an abstract of title, is worth no more than an exactly similar abstract would be, no matter how much might be the difference in property value; how much the difference in time and labor involved in producing the condensed result; how intricate the questions involved in the one as compared to the other, and things of like nature. It is the result that is paid for, and the amount to be paid is to be ascertained by certain fixed prices, dependent upon the number of items or instruments that are finally decided upon as proper to appear in the abstract.

On the other hand, it is contended that the business of title abstracting is a particular branch of the profession of law; that it requires for a proper conduct of such branch of law a comprehensive legal knowledge, especially of all law relating to real estate; that it requires care, skill and a power of wise discrimination in ascertaining the existence, bearing and effect of the various instruments of record that may or may not touch upon the title of a particular piece of real estate; and that competency to examine a title and make an abstract thereof, even from public records, necessarily depends upon the legal learning of the abstracter, the experience he has had in making abstracts, the care and skill exercised in searching the records, and the power of discreet judgment and discrimination exercised by him in applying any given record to the title under investigation; and, as a consequence, that the compensation therefor is not to be measured by any arbitrary fixed rate established by professional abstracters of records, but is rather to be determined by the rate usually paid for such services to persons of the competence as above defined taken in connection with the value of the property and the risk assumed by the abstracter.

Evidence was produced at the trial as to the value of such services viewed from the two positions assumed by the parties; but the true question in this case, viz., the present status of an abstracter, whether he is to be considered as a man charged with the necessary legal learning and assuming large risks and responsibilities, or as a mere mechanical agent producing from transcription of the records a condensed result called an abstract, did not receive much light from the evidence.

I certainly can not decide this question as a matter of law, so that it must necessarily depend upon the evidence. And the evidence in the case has not satisfied me that as yet the abstracter has changed his former relations and disappeared from the profession of the law, and become instead a member of a guild whose business it is to furnish abstracts as mercantile commodities, and sell them as such; or that his compensation should be measured on such a basis.

The question has given me a great deal of mental worry in my anxiety to solve it rightly and do, as near as I can, exact justice between the parties to this case. But I am unable to see how an abstract of title which is the result, as said before, of the time, labor and legal knowledge of one skilled in such affairs, can be likened to an article of merchandise bought and sold in the market. There is something more in an abstract than the paper of which it is composed and the words written or printed thereon, and that something more is the confidence reposed by the employer in the maker of the abstract, and the reliance placed upon the result of his knowledge, labor and skill whereby the employer is willing to part with his money on the faith of them. This confidence and reliance is something you can't buy in the open market; it has its origin in other ways, in various ways obvious to all. You can put a fixed, definite value or price upon the time and labor employed in producing an abstract, and upon the corporeal materials of which the abstract is composed, and you may make that price or value uniform. But over and beyond these things lies what I call this power of discrimination, in order to correctly and truly determine what does not affect the title investigated, and which power necessarily includes as precedent to its exercise a thorough knowledge of the law bearing upon real estate, and that is an element entering into the production of every abstract of title upon which you cannot put a fixed price which shall be uniform for all. It is this factor which begets for each individual abstracter the particular degree of confidence reposed in him by his particular employer, and which, in turn, imposes upon him the correlative risks and responsibilities to be implied from a failure to have or exercise the legal knowledge necessary to a proper and correct judgment of the instruments or items that may affect the particular title.

In the view that I take of it, there can never be a uniform rule or scale of prices for an abstract of title, if the element of legal knowledge and the application of that legal knowledge are to be considered as entering at all into a consideration of the value of the services. And I cannot see how they can be ignored, if an abstract of title is to be deemed as representative of anything. Entertaining this view, it is my judgment that the plaintiff must prevail on the

evidence offered by him, and the judgment will be for him in the amount prayed for.

Sidney G Stricker for plaintiff; Robert Ramsey, contra.

---

(Hamilton County Common Pleas.)

## O. REICH v. THE PIKE BUILDING COMPANY.

1. In a suit in attachment against a non-resident, jurisdiction is acquired by the seizure of the property, and judgment can be rendered only in an amount equal to the value of the property seized.

2. Where there is no actual seizure of property, but the garnishee appears and offers to deliver the property to the court, but is not ordered to do so or to give bond, no property comes into the custody of the court, and jurisdiction is not conferred.

3. It is error to render personal judgment against a defendant who appears under such circumstances to move a dismissal of the attachment, and for no other purpose.

4. Where a rairoad company is served with notice of attachment within ten minutes after the goods described have been loaded into a car in Cincinnati bound north, the court will presume that the goods were still within the territorial jurisdiction of the magistrate.

5. As to whether a writ of garnishment does or does not bind a common carrier with respect to goods of the defendant in attachment, in transit, when the goods are at the time of service of the writ within the territorial jurisdiction of the magistrate, the court does not find it necessary to express an opinion.

---

HOLLISTER, J.

The plaintiff sued the defendant for rent before a justice of the peace, caused an attachment to issue, and process of garnishment was served on the Cleveland, Cincinnati, Chicago and St. Louis Railway Company, at 4.30 p. m., July 19, 1900. The writ of attachment was returned *nulla bona*, and the ganishee answered that at the time of service of the writ it had in transitu, from Cincinnati to New York, one car load of household goods and office fixtures, consigned from O. Reich from Cincinnati to O. Reich, New York; that it directed, in pursuance of the writ, that the car be stopped at Cleveland, where it is held subject to the order of the court. The garnishee claimed a lien for freight charges and car service. The magistrate ordered the garnishee to deliver the property to the court. The constable who served the order made his return that the garnishee answered that it was ready to turn over, on the court's order, the property it held upon payment of its lien and accruing charges. The plaintiff proceeded to advertise for defendant, with notice of attachment, as prescribed by law.

Upon the hearing came the defendant by his counsel, and "without entering his appearance herein, and without waiving any of his rights and for the purpose of this motion only, moves the court to dismiss the attachment herein and to release the property claimed to have been attached and garnisheed in this proceeding, for the reason that the said goods are not subject to attachment or garnishment, as the same were in transit at the time of the purported attachment and garnishment thereof, and for the further reason that order of attachment was not made effective by attachment of the property, and the court therefore has no jurisdiction of the subject matter."

The magistrate overruled the motion, and found that the "appearance of the defendant was entered because of his filing of said motion," and entered a personal judgment against him for $293.59, the amount of plaintiff's claim and interest and for costs. The defendant prosecutes these proceedings in error, claiming that the magistrate erred in overruling his motion to dissolve the attachment and in entering personal judgment against him.

At the trial it appeared that the goods were delivered to the railroad company, commencing "at 10 o'clock and completing the same a little after 3 o'clock, probably very nearly 3.30 in the afternoon" of July 19, 1900, and the car containing the goods was probably in the yards of the company in the western part of the city awaiting at the time the writ was served, but this is a mere "impression" of the counsel for the railroad company. The counsel also wrote a letter saying that he was advised that the car containing the goods was then (at the time of trial) in the yards of the company at Cincinnati, "or will be tomorrow.

It is clear that the magistrate could not properly render a personal judgment against the defendant as upon his appearance in court. There is ample authority for a proceeding, such as was defendant's, to obtain a discharge of the attachment, appearing for that purpose only.

The case does not fall within the ruling in Elliot v. Lawhead, 43 O. S., 171. There the defendant filed a motion, coming for the purpose of the motion and for no other, to strike the case from the docket and to dismiss the action "for want of proper and legal service," and because the court had no jurisdiction of the "subject matter of said action or of defendant." It was held that the motion involved the merits of the case made in the petition, citing Handy v. Insurance Company, 37 Ohio St., 366: Maholm v. Marshall, 29 Ohio St., 611.

Here the motion was directed to the attachment alone, upon he ground among others that, as no property was attached, the court had not acquired jurisdiction of the subject matter. The subject matter of action was debt for rent, to which the proceeding in attachment was merely ancillary. Jurisdiction to render judgment upon attachment of property does not involve the subject matter of the action at all, but arises by virtue of the fact that the property of the defendant has, by the attachment, been taken into custody of the court.

It is true that a judgment may be rendered when property of the defendant is seized either in attachment or garnishment, to the full amount of plaintiff's claim. The Cleveland Co-operative Stove Co. v. Mehling, 21 C. C., 60 (45 W. L. B. No. 3, January 21st, 1901);